1  William J. Doyle, II (SBN 188069)
   Chris W. Cantrell (SBN 290874)
2  **DOYLE APC**
   550 West B Street, Fourth Floor
3  San Diego, CA 92101
   Telephone: (619) 736-0000
4  Facsimile: (619) 736-1111
   *Attorneys for Plaintiff*
5

6

7              UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
8

9  JOHN HLEBO, JR.,                    Case No.: 5:22-cv-03076

10                        Plaintiff,
                                       **COMPLAINT FOR MONEY
11 v.                                  DAMAGES**

12 COVIDIEN, L.P., COVIDIEN, INC.,
   COVIDIEN LTD, COVIDIEN PLC,         **1. STRICT LIABILITY –
13 COVIDIEN HOLDING INC.,                 MANUFACTURING DEFECT**
   COVIDIEN, LLC, MEDTRONIC USA,
14 INC., MEDTRONIC PLC, SOFRADIM       **2. STRICT LIABILITY – FAILURE
   PRODUCTION SAS, SOFRADIM              TO WARN**
15 CORP., TYCO INTERNATIONAL
   LTD, TYCO INTERNATIONAL             **3. NEGLIGENCE**
16 GROUP SA, SURGICAL SOLUTIONS
   GROUP and UNITED STATES            **4. FRAUDULENT CONCEALMENT**
17 SURGICAL GROUP,
                         Defendants.   **5. NEGLIGENT
18                                        MISREPRESENTATION**

19                                     **6. PUNITIVE DAMAGES**

20                                     **JURY TRIAL DEMANDED**

21

22

23

24

25

26

27

28

1   PLAINTIFF JOHN HLEBO, JR. hereby files this Complaint against

2   COVIDIEN, INC., COVIDIEN LTD, COVIDIEN PLC, COVIDIEN HOLDING

3   INC., COVIDIEN, LLC, MEDTRONIC USA, INC., MEDTRONIC PLC,

4   SOFRADIM PRODUCTION SAS, SOFRADIM CORP, TYCO INTERNATIONAL

5   GROUP S.A., TYCO INTERNATIONAL LTD, SURGICAL SOLUTIONS GROUP

6   and UNITED STATES SURGICAL GROUP (collectively, "Defendants" or

7   "Covidien") and shows unto the Court as follows:

8                              **PARTIES**

9       1.  Plaintiff John Hlebo, Jr. is a 61 year-old resident citizen of the State of

10  California residing in the City of Volcano, County of Amador, California. At all material

11  times hereto, Plaintiff was a resident citizen of the State of California residing in

12  Amador County. On October 31, 2005, Plaintiff underwent surgery to repair a right

13  inguinal hernia at Good Samaritan Hospital in San Jose, California.  The surgery,

14  performed by Jeffrey Doty, MD, involved implanting a Covidien Parietex Progrip Mesh

15  (Lot# SFE00061) to repair the right inguinal hernia. A short time later, Plaintiff

16  underwent surgery to repair an inguinal hernia on his left side. The surgeon, Jeffrey

17  Doty, MD, again utilized a Covidien Parietex Profrip Mesh to repair the left inguinal

18  hernia. As a proximate result of the Parietex Progrip Mesh Implants Plaintiff suffred

19  permanent injuries and significant pain and suffering, emotional distress, loss wages and

20  earnings capacity, and diminished quality of life. Plaintiff respectfully seeks damages in

21  excess of $75,000 for all damages to which she may be legally entitled.

22      2.  Defendant COVIDIEN, INC. ("Covidien Inc.") is a Delaware corporation

23  with its principal place of business at 15 Hampshire Street, Mansfield, Bristol County,

24  Massachusetts, and offices and facilities in Bedford and Waltham, Middlesex County,

25  Massachusetts, and Boston, Suffolk County, Massachusetts.  All acts and omissions of

26  Covidien Inc. as described herein including but not limited to those resulting in the

27  design, manufacture, marketing, labeling, distribution, sale and placement of its Parietex

28  Progrip Mesh at issue in the instant suit into Middlesex County, were done by its

agents, servants, employees and/or owners, acting in the course and scope of their representative agencies, services, employments and/or ownership. At all times material hereto, Covidien Inc. did business in Massachusetts.

3. Defendant COVIDIEN, LTD. ("Covidien ltd.") is a Bermuda public limited company with its principal place of business in Bermuda, and offices in Bedford and Waltham, Middlesex County, Massachusetts.  All acts and omissions of Covidien ltd. as described herein including but not limited to those resulting in the design, manufacture, marketing, labeling, distribution, sale and placement of its Parietex Progrip Mesh at issue in the instant suit into Middlesex County, were done by its agents, servants, employees and/or owners, acting in the course and scope of their representative agencies, services, employments and/or ownership. At all times material hereto, Covidien ltd. did business in Massachusetts.

4. Defendant COVIDIEN PLC ("Covidien plc") is an Irish public limited company with its principal place of business in Massachusetts at 15 Hampshire Street, Mansfield, Bristol County, Massachusetts, and offices in Bedford and Waltham, Middlesex County, Massachusetts.  All acts and omissions of Covidien plc as described herein including but not limited to those resulting in the design, manufacture, marketing, labeling, distribution, sale and placement of its Parietex Progrip Mesh at issue, were done by its agents, servants, employees and/or owners, acting in the course and scope of their representative agencies, services, employments and/or ownership. At all times material hereto, Covidien plc did business in Massachusetts.

5. Defendant COVIDIEN HOLDING INC., ("Covidien Holdings") is a corporation that is incorporated under the laws of the State of Delaware.  Covidien Holdings has its principal place of business at 15 Hampshire Street, Mansfield, Bristol County, Massachusetts, and offices in Bedford and Waltham, Middlesex County, Massachusetts. Covidien Holdings has a registered agent in Massachusetts at CT Corporation System, 155 Federal Street, Ste. 700, Boston, Massachusetts, 02110.

1  Covidien Holdings focuses its business on products in key surgical specialties, including

2  hernia repair, laparoscopic instrumentation, embolization device, pharmaceuticals and

3  medical supplies. Prior to September 5, 2012, Covidien Holdings was f/k/a and

4  operated as Covidien, Inc.

5  6. Defendant COVIDIEN, LLC (d/b/a Covidien LP) ("Covidien llc"), is a

6  Delaware limited partnership with its principal place of business at 15 Hampshire

7  Street, Mansfield, Bristol County, Massachusetts, and offices in Bedford and Waltham,

8  Middlesex County, Massachusetts.

9  7. Defendant SURGICAL SOLUTIONS GROUP ("Covidien Surgical") is a

10  Delaware corporation with its principal place of business in Colorado, and is a wholly

11  owned subsidiary of Covidien Ltd.  All acts and omissions of Covidien Surgical as

12  described herein were done by its agents, servants, employees and/or owners, acting in

13  the course and scope of their respective agencies, services, employments and/or

14  ownership. At all times material hereto, Covidien Surgical did business in

15  Massachusetts.

16  8. Defendant UNITED STATES SURGICAL CORP. ("U.S. Surgical") is a

17  Delaware corporation with its principal place of business in Connecticut, and is a

18  wholly owned subsidiary of Covidien plc.  U.S. Surgical is registered to do business in

19  Massachusetts, with a registered agent in the Commonwealth.  It also shares the same

20  corporate directors as Covidien US.  All acts and omissions of U.S. Surgical as

21  described herein including but not limited to those resulting in the design, manufacture,

22  marketing, labeling, distribution, sale and placement of its Parietex Progrip Mesh here,

23  were done by its agents, servants, employees and/or owners, acting in the course and

24  scope of their representative agencies, services, employments and/or ownership.  At all

25  times material hereto, U.S. Surgical did business in Massachusetts.

26  9. Defendant SOFRADIM PRODUCTION SAS ("Sofradim Production")

27  is a French company with its principal place of business at 116 Avenue Du Formans,

28  Trevoux, France, 01600.  All acts and omissions of Sofradim as described herein were

1  done by its agents, servants, employees and/or owners, acting in the course and scope

2  of their respective agencies, services, employments and/or ownership.

3      10.    Defendant SOFRADIM CORP. ("Sofradim") is a company with its

4  principal place of business in Mansfield, Bristol County, Massachusetts and offices in

5  Wrentham, Norfolk County, Massachusetts. All acts and omissions of Sofradim Corp.

6  as described herein were done by its agents, servants, employees and/or owners, acting

7  in the course and scope of their respective agencies, services, employments and/or

8  ownership.

9      11.    Defendant, TYCO INTERNATIONAL LTD. ("Tyco") (d/b/a Covidien,

10  Inc.) is a company incorporated in Massachusetts with a registered agent in the

11  Commonwealth with its principal place of business at 15 Hampshire Street, Mansfield,

12  Bristol County, Massachusetts. Tyco is the parent company for Defendants TIGSA,

13  through its subsidiaries, engaged in the healthcare business.  All acts and omissions of

14  Tyco as described herein including but not limited to those resulting in the design,

15  manufacture, marketing, labeling, distribution, sale and placement of its Parietex

16  Progrip Mesh at issue in the instant suit into Middlesex County, were done by its

17  agents, servants, employees and/or owners, acting in the course and scope of their

18  representative agencies, services, employments and/or ownership. At all times material

19  hereto, Tyco did business in Massach

20      12.    Defendant TYCO INTERNATIONAL GROUP S.A., ("TIGSA")

21  (d/b/a Covidien, Inc.) is a Delaware limited partnership with a registered agent in

22  Delaware limited partnership with its principal place of business at 15 Hampshire

23  Street, Mansfield, Bristol County, Massachusetts. TIGSA is a holding company and

24  wholly owned subsidiary of Tyco that, through its subsidiaries, engaged in the

25  healthcare business.  All acts and omissions of TIGSA as described herein including but

26  not limited to those resulting in the design, manufacture, marketing, labeling,

27  distribution, sale and placement of its Parietex Progrip Mesh at issue in the instant suit

28

4

COMPLAINT

1   into Middlesex County, were done by its agents, servants, employees and/or owners,

2   acting in the course and scope of their representative agencies, services, employments

3   and/or ownership. At all times material hereto, TIGSA did business in Massachusetts

4       13.    Defendant MEDTRONIC USA INC. and MEDTRONIC plc f/k/a

5   Medtronic Inc. & Covidien plc, (collectively referred to as "Medtronic") is a

6   corporation that is incorporated under the laws of the State of Minnesota, with offices

7   and facilities at 12 Gill Street, Woburn, Middlesex County, Massachusetts and Boston,

8   Suffolk County, Massachusetts. It is the corporate parent/stockholder of COVIDIEN

9   and all of its subsidiaries and entities.  All acts and omissions of Medtronic as described

10  herein were done by its agents, servants, employees and/or owners acting in the course

11  and scope of their respective agencies, services, employments and/or ownership.

12      14.    Sofradim and its parent and affiliates were acquired by Covidien or its

13  predecessor and are now wholly owned by Covidien.  Since its acquisition by Covidien,

14  Sofradim has been a business unit or division of Covidien.  Since its acquisition by

15  Covidien, Sofradim has been referred to as the "Trevoux Plant" of Covidien and is

16  considered a manufacturing facility for the surgical device business unit of Covidien.

17  Sofradim is registered with the U.S. Food and Drug Administration ("FDA") as an

18  "establishment," which is the functional equivalent of a manufacturing facility or

19  production plant.  Covidien or its corporate affiliates are listed with the FDA as the

20  "owner/operator" of Sofradim, which makes Covidien "directly responsible for the

21  activities" of Sofradim.  Since the acquisition of Sofradim by Covidien, the officers,

22  managers and employees of Sofradim have been employees of Covidien.

23      15.    In January 2015, Medtronic acquired Covidien LP. From the date of

24  acquisition, Medtronic has been responsible for the actions of Covidien and exercised

25  control over Covidien's functions specific to the oversight of and compliance with

26  applicable safety standards relating to and including the Parietene  Mesh sold in the

27  United States. In such capacity, Medtronic committed or allowed to be committed

28  tortious and wrongful acts, including the violation of numerous safety standards relating

to device manufacturing, quality assurance/control, and conformance with design and manufacturing specifications. Medtronic's misfeasance and malfeasance, including failure to warn the public of known problems with their products, caused Plaintiff to suffer injury and damages.

16.     Medtronic, directly and/or through the actions of Covidien has at all pertinent times been responsible for the research, development, design, testing, manufacture, production, marketing, promotion, distribution and/or sale of all Mesh Device described herein.

17.     Defendants are individually, jointly and severally liable to Plaintiff for damages suffered by Plaintiff arising from the Defendants' design, manufacture, marketing, labeling, distribution, sale and placement of its hernia mesh products, including their line of Mesh Device, effectuated directly and indirectly through their respective agents, servants, employees and/or owners, all acting within the course and scope of their representative agencies, services, employments and/or ownership.

18.     At all relevant times herein, Defendants were engaged in the design, manufacture, production, testing, study, research, training, inspection, labeling, marketing, advertising, sales, promotion, and/or distribution of the Products. Defendants do business throughout the United States, and at all relevant times hereto, marketed, promoted, warranted, and/or sold their products in the Commonwealth of Massachusetts.

## **VENUE AND JURISDICTION**

19.     Damages sought in this matter are in excess of $75,000.00. Subject matter jurisdiction is proper under 28 U.S.C. § 1322.

20.     This Court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a). This Court has diversity subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because it is a civil action in which the matter in controversy

1    exceeds the sum or value of $75,000, exclusive of interests and costs, and complete

2    diversity exists between Plaintiff and all Defendants.

3         21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and (c)

4    because the events or omissions giving rise to Plaintiff's claims occurred in this district.

5    Specifically, the Plaintiff currently resides and resided at all times relevant hereto in this

6    district. Further, all of Plaintiff's hernia mesh implant surgeries as well as all surgeries to

7    treat complications from the hernia mesh implants occurred in this district.

8         22.    This Court has personal jurisdiction over Defendants because Defendants

9    have conducted and continue to conduct, substantial business in the State of California

10   and in this District; distribute Covidien Products in this District; receive substantial

11   compensation and profits from sales of Covidien Products in this District; and make

12   material omissions and misrepresentations and breaches of warranties in this District.

13   Defendants contacts with the State of California and this District are substantial,

14   systematic and continuous

15        23.    Defendants have purposely availed themselves to the privilege of

16   conducting business within this State and have the requisite minimum contacts with

17   this State such that the maintenance of this suit does not offend traditional notions of

18   fair play and substantial justice and that Defendants should reasonably anticipate being

19   hailed into Court here.

20                                    **FACTS**

21   **Plaintiff**

22        24.    Plaintiff John Hlebo, Jr. currently resides, and resided at all times material

23   hereto in Upland, California. On or about October 31, 2005, Plaintiff Hlebo underwent

24   surgery at Good Samaritan Hospital in San Jose, California to repair a recurrent right

25   inguinal hernia. The surgery was performed by Jeffrey Doty, MD and a Parietal Mesh

26   Parietex right side anatomical mesh was implanted to treat the right inguinal hernia

27   (Lot#: SFE00061 and Ref: TECT 1610 A Right). The Parietal Mesh Parietex was

28   manufactured and sold by Tyco Healthcare which became Covidien, LP in 2007.

1    Shortly thereafter, Plaintiff underwent surgery to repair a left inguinal hernia and a

2    Parietal Mesh Parietex left side anatomical mesh was implanted.

3         25.    In spring of 2020, Plaintiff began to experience bi-lateral  iinguinal pain

4    that continued to worsen over the next few months. Plaintiff was examined by David

5    Melniczek, MD of Sutter Health.  After examining Plaintiff, Dr. Melniczek noted "[t]he

6    patient is reporting pain that is 7 out of 10 or greater. He tells me that it sometimes

7    positional and that he has to stretch certain ways to make it go away. He says that it

8    comes and goes throughout the day, but occurs chronically. It wakes him up at night

9    and he has to change positions. Patient says that he has pain in his testicles." Dr.

10   Melniczek concluded "the patient's pain is secondary to mesh. It appears to be

11   herniating through the internal ring on the right side. … A majority of the symptoms

12   attributed to the mesh falling up at the internal ring on both sides. Also looks like he

13   has a recurrent hernia on the right side. … His symptoms resemble patients with plug

14   and patch open repairs where the plug is stuffed into the internal ring rather than

15   opened in the preperitoneal space. This type of pain is mesh related." Dr. Melzniczek

16   recommended surgery to excise the right-sided inguinal mesh.

17        26.    On June 8, 2020, Plaintiff underwent surgery to excise the Parietex mesh

18   on the right side at Sutter Health Amador Hospital in Jackson, California. Dr.

19   Melniczek was able to partially excise the Parietex right-sided mesh but the surgery was

20   very difficult and tedious. In the Operative Report, Dr. Melniczek stated "[e]xtreme

21   scarring occurred secondary to mesh. Surgery was very challenging. Extreme scarring

22   secondary to mesh resulting in bleeding." After encountering the mesh, Dr. Melniczek

23   continued:

24        I encountered the mesh and then the mesh stuck to the peritoneum. So
         the mesh was then separated from the muscle beneath it. I separated the
25        Parietex mesh all the way down to pubis. This required dividing the right
         epigastric vessels as they were entangled with the scar tissue. I was unable
26        to successfully remove any of the Parietex mesh around the internal ring. I
27        dissected all the way past medial and it does appear that the patient had a

28

single piece of Parietex mesh laid the whole way across his preperitoneal space. So I had to divide the mesh in the midline and then take it off the pubis and it was dissected all the way down to the internal ring but not beyond there. Then the mesh was carefully divided. I encountered bleeding just to the left of the pubis in the midline coming from the mesh.

After this four-hour surgery, Plaintiff was discharged home the following day.

27.    The June 8, 2020 surgery alleviated some of the pain Plaintiff was experiencing on the right side but the pain on the left side continued. Dr. Melniczek recommended Plaintiff undergo surgery to remove the left-sided Parietex mesh in the hope that this would lessen his chronic left-sided inguinal pain. On October 19, 2020, Plaintiff underwent surgery to remove the Parietex Progrip from his left inguinal area at Sutter Health Amador Hospital. After entering Plaintiff's left inguinal area, Dr. Melniczek again found "severe scarring" in the preperitoneal space. The left-sided Parietex mesh was found to be "balled up and adherent to a lot of tissue structures." However, after careful dissection, Dr. Melniczek was able to remove all of the left-sided Parietex mesh.

**Defendants' Parietex Mesh Implants**

28.    Parietex Progrip Mesh is a knitted, multifilament, polyethylene terephthalate (polyester) mesh that contains an absorbable, hydrophilic collagen layer on one side.

29.    The version of Parietex implanted in Plaintiff went through the FDA's lax 510(k) clearance process in February 2005. Sofradim, the manufacturer, represented that this modification of Parietex mesh was  "substantially equivalent" to a previously 510(k) cleared Parietex Progrip Mesh the Bard Composix Kugel Mesh as well as an earlier iteration of the Parietex Composite Mesh. Demonstrating the laxity of the 510(k) process, one of the predicate devices used by Defendants was a mesh with a completely different filament and made of a completely different synthetic ( Bard Composix Kugel Mesh was a *monofilament, polypropylene* mesh whereas Parietex was a *multi-filament, polyethylene* mesh).  Even worse, the Composix Kugel Mesh was removed from the market due to safety concerns.

30.    Defendants Coviden/Medtronic sought and obtained FDA clearance to market the Parietex Progrip Mesh under Section 510(k) of the Medical Device Amendment to the Food, Drug and Cosmetics Act. The "510(k) clearance process" refers to Section 510(k) of the 1976 Medical Device Amendments to the Federal Food, Drug and Cosmetic Act (MDA). Under this process, medical device manufacturers are only required to notify the FDA at least 90 days before they market a device that is alleged to be "substantially equivalent" to a device the FDA had approved for sale before 1976 (when the MDA was enacted).

31.    No clinical testing or clinical study is required to gain FDA clearance under this process. Instead, a given device was supposed to demonstrate substantial equivalence to a predicate medical device that the FDA had approved for sale prior to the MDA enactment (pre-1976).

32.    Subsequent amendments to the MDA allowed for 510(k) clearance of implants deemed "substantially equivalent" to post-MDA, 510(k)-cleared devices. In short, medical devices could now be cleared within 90, without any testing for safety and efficacy, solely by alleging the device is substantially equivalent to a device that itself was cleared without any safety or efficacy testing.

33.    Therefore, clearance under the 510(k) process does not equate to FDA approval of the cleared medical device. The 510(k) process is not a formal review for safety or efficacy. No clinical testing or clinical study is required to gain FDA clearance under this process.

34.    At the request of the FDA in 2012, the National Institute of Health (NIH) conducted a thorough review of the 510(k) process, reaching the following major conclusion:

> **The 510(k) clearance process is not intended to evaluate the safety and effectiveness of medical devices with some exceptions. The 510(k) process cannot be transformed into a pre-market evaluation of safety and effectiveness so long as the standard for**

**clearance is substantial equivalence to any previously cleared device.**

35. The NIH explained: "The assessment of substantial equivalence does not require an independent demonstration that the new device provides a 'reasonable assurance of safety and effectiveness.'" Further, the NIH even pointed out that the classification of predicate devices approved for sale prior to 1976 "did not include any evaluation of the safety and effectiveness of individual medical devices . . .Thus it is common for devices to be cleared through the 510(k) program by being found substantially equivalent to devices that were never individually evaluated for safety and effectiveness, either through the original device classification program or through the 510(k) process."

36. As the NIH noted, the use of devices that were never evaluated for safety and efficacy as predicate devices gives no assurances of safety and efficacy for the applicant 510(k) device. However, Defendants and other hernia mesh manufacturers, exploited the 510(k) process even more by using mesh implants that were eventually removed from the market due to safety and efficacy problems as the predicate devices to get 510(k) clearance.

37. Upon information and belief, no formal review for safety or efficacy was ever conducted for the Parietex Mesh.

38. Defendants marketed and sold their polyester hernia meshes to the medical community at large and patients through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, aggressive marketing to health care providers at medical conferences, hospitals, and private offices, as well as the provision of valuable benefits to health care providers. Defendants further utilized documents, patient brochures, and websites.

39. The polyester polymer used in the design of Defendants polyester hernia meshes, like the Parietex Progrip at issue here, is more brittle and significantly more susceptible to fatigue fracture, breakage, fragmentation and other mechanical failures than alternative polymers, including but not limited to polyvinylidene fluoride (PVDF)

and polypropylene. Peer-reviewed, published literature prior to the introduction of Defendants' PET mesh in the U.S. concluded that "Polyester mesh should no longer be used for incisional hernia repair." Leber, et al. *Long-term complications associated with prosthetic repair of incisional hernias*. **Arch Surg.** 1998; 133(4):378-82. Subsequent literature observed that "the use of PET in hernia surgery is at least questionable in respect to the obligate long-term degradation of this polymer," Klosterhalfen, et al., *Polymers in hernia repair – common polyester vs. polypropylene surgical meshes*. **J. Materials Science** 35:4769-4776 (2000), that "[i]t has also been reported that patients with polyethylene mesh implants have higher incidences of wound-healing complications, fistula and seroma formation and higher incidences of hernia recurrence as compared to polypropylene meshes" and that "due to the loss of stability and the reported mesh-related complications, polyethylene meshes nowadays do not seem fully suitable for a permanent reinforcement of the abdominal wall." Schumpelick, et al. *Light weight meshes in incisional hernia repair*. **J. Minim Access Surgery**. 2006;2(3):117-23.

40. The polyester material used in the Defendants' mesh is susceptible to degradation by hydrolysis, oxidation and/or enzymatic degradation. *See, e.g.*, Smith, et al. *The enzymatic degradation of polymers in vivo*. **J Biomed Mater Res** 1987; 21: 991-1003 (demonstrating degradation of polyester by certain enzymes); Riepe, et al. *Long-term in vivo alterations of polyester vascular grafts in humans*. **Eur J Vasc Endovasc Surg.** 1997;13(6):540-8 (Study of explanted polyester implant Device demonstrating in vivo hydrolytic degradation with scission of macromolecular chains and loss of strength); King, et al. *Microstructural changes in polyester biotextiles during implantation in humans*. **Journal of Textile and Apparel, Technology and Management**. 2001;1(3):1-8 (demonstrating biodegradation and loss of mechanical strength of polyester implants); Schumpelick, *supra* ("One problem of polyethylene meshes is their degradation, which leads to a reduced mechanical stability after 10 years."); Robinson, et al. *Major mesh-related complications following hernia repair: events reported to the Food and Drug Administration.*

**Surg Endosc.** 2005; 19(12): 1556-60 ("Incorporated PET can be degraded hydrolytically, resulting in an increased brittleness of the polymer with loss of the mechanical features."); Voskerician, et al. *Effect of biomaterial design criteria on the performance of surgical meshes for abdominal hernia repair: a pre-clinical evaluation in a chronic rat model.* **J Mater Sci Mater Med.** 2010;21(6):1989-95 ("While materials such as PP and PTFE will not undergo hydrolytic degradation, PET, a polyester, will. Further, PET is also susceptible to oxidative degradation due to its ester groups, enhanced by a supplementary degradation mechanism common to all polymers, the direct oxidation by the host. The latter degradation mechanism is the result of host generated molecular species culminating with a foreign body reaction characterized by a continuous process of frustrated phagocytosis by the foreign body giant cells."); Klosterhalfen, et al., *Pathology of traditional surgical nets for hernia repair after long-term implantation in humans.* **Der Chirurg** 2000:71:53-51 (microscopic examination of fragmented and fractured Mersilene (multifilament polyester) mesh after explantation showed pronounced splitting and degradation of polyester fibers). The individual polyester fibers that make up the PET mesh are unreasonably susceptible to degradation. The gamma irradiation sterilization of the PET produces free radicals that contribute to degradation before implant.

41.    The polyester material used in the PET Device incites inflammation and heightened foreign body response, which increases the risks of post-operative complications. Jin, et al., *Human peritoneal membrane controls adhesion formation and host tissue response following intra-abdominal placement in a porcine model.* **J. Sur. Res.** 2009;156(2):297-304 (noting polyester-collagen composite had higher foreign body reaction than other materials); Zinther, et al. *Shrinkage of intraperitoneal onlay mesh in sheep: coated polyester mesh versus covered polypropylene mesh.* **Hernia**. 2010;14(6):611-615 (noting statistically significant increase in shrinkage rate for Parietex versus covered polypropylene mesh and further noting histology showed "marked inflammatory reaction with giant cells adjacent to the polyester filaments, which was absent in the polypropylene specimens"); Orenstein, et

al. *Comparative analysis of histopathologic effects of synthetic meshes based on material, weight, and pore size in mice.* **J Surg Res.** 2012;176(2):423-9 ("[P]olyester-based meshes appear to create a local hostile environment with marked foreign body reaction and chronic inflammatory response" and "[o]f the five synthetic meshes implanted, the polyester-based mesh was the greatest inducer of inflammation and appeared to impose severe chronic foreign body reaction."); Nguyen, et al., *Influence of a new monofilament polyester mesh on inflammation and matrix remodeling.* **J. Invest. Surg.** 2012;25(5):330-9 (noting heightened inflammatory response with multifilament polyester material both at molecular level and histologically and recognizing the potential clinical implantations "as there is a higher associated risk for postoperative complications and delayed wound healing in the setting of a persistent and prolonged inflammatory response after mesh implantation."); van 't Riet, et al. *Prevention of adhesion to prosthetic mesh: comparison of different barriers using an incisional hernia model.* **Ann Surg.** 2003;237(1):123-128 ("in the group with Parietex mesh, a more severe inflammatory reaction was found, with the presence of many admixed inflammatory cells and microabscesses (grade 3 on the inflammation grading scale)."); Voskerician, *supra* (observing host tissue response elevated and arrested in a chronic inflammatory phase in the presence of PET mesh).

42.     The polyester polymer used in the PET mesh design is significantly more susceptible to loss of mechanical strength over time than alternative materials. Robinson, et al. *Major mesh-related complications following hernia repair: events reported to the Food and Drug Administration.* **Surg Endosc.** 2005; 19(12): 1556-60 ("A significant disadvantage of polyester is loss of mechanical strength over time…, which may lead to hernia recurrence.  Polyester is not commonly implanted in the United States, and its continued use for incisional hernia repair has been questioned.").

43.     Due to the hydrophilic nature of the PET mesh, the strands of polyester attract and retain bodily fluids, resulting in excessive swelling of the mesh, further increasing the weight and density of the mesh after implant and thus the foreign body

1    load, which increases and prolongs the inflammatory and foreign body reaction to the
2    PET mesh.

3       44.    The fragmentation or flaking-off of particles of the PET fibers
4    exacerbates inflammation and prolonged and excessive foreign body reaction. This
5    chronic and excessive inflammatory and foreign body reaction, in turn, exacerbates the
6    degradation of the mesh fibers in a vicious cycle. The degradation and fragmentation
7    of the fibers within the PET mesh can lead to the total loss of functionality of the
8    mesh.

### PERMANENT NON-INERT POLYMER IN PARIETEX PROGRIP MESH: DEFECTS & RISKS

11       45.    Defendants' Parietex Progrip Mesh contains a permanent, non-inert
12    polymer, specifically polyester. Despite Defendants' claims that polyester is inert,
13    scientific evidence shows that polyester is biologically incompatible with human tissue
14    and incite a chronic immune response in much of the population after implantation.
15    The immune response promotes degradation and contracture of the mesh, as well as
16    the surrounding tissue, and can contribute to the formation of severe adverse reactions
17    to the Parietex Progrip Mesh.

18       46.    The Parietex Progrip Mesh is defective due to its high rates of failure,
19    injury, and complications, its failure to perform as intended, its requirement of frequent
20    and often debilitating re-operations, and its cause of severe and irreversible injuries,
21    conditions, and damage to numerous patients, including Plaintiff.

22       47.    The specific nature of the Parietex Progrip Mesh's defects includes, but is
23    not limited to, the following:

      a) The use of polyester in the Device and the immune reactions resulting from such material, causes adverse reactions and injuries.

      b) Adverse reactions to the polyester in the Device consist of adhesions, injuries to nearby organs, nerves, or blood vessels, and other complications, including infection, chronic pain, and hernia recurrence.

c) The Device has a propensity to degrade or fragment over time, causing a chronic inflammatory and fibrotic reaction, and resulting in continuing injury over time as the polyester acts as a chronic trigger for inflammation.

d) Upon information and belief, Defendants utilized various substandard and/or adulterated polyester in the Device.

e) The weave of the Device produces very small interstices allowing bacteria to enter and hide from white blood cells and macrophages—the host defenses designed to eliminate bacteria. The bacteria also secrete an encasing biofilm, serving to further protect them from destruction by white blood cells and macrophages. In addition, some bacteria are capable of accelerating the degradation of polyester.

f) The polyester contains numerous additive compounds, which leach from the Device and are toxic to tissue, enhancing the inflammatory reaction and the intensity of fibrosis.

g) Scanning electron microscopy has shown polyester to not be inert, with degradation leading to flaking, fissuring, and release of toxic compounds. This enhances the inflammatory and fibrotic reactions.

h) For decades, polyester was known to shrink 30-50+%.

i) Polyester is subject to oxidation by acids and other byproducts produced during the inflammatory reaction, causing degradation and loss of compliance.

j) Inadequate porosity. Mesh porosity is important for tissue ingrowth, with low porosity decreasing tissue incorporation. Porosity also affects the inflammatory and fibrotic reaction. With mechanical stress, the effective porosity is decreased.

k) After implantation in the human body, polyester is known to depolymerize, cross-link, undergo oxidative degradation by free radicals, and stress crack.

l) The Device has a tendency to unravel or fray, causing polyester fibers to protrude from the mesh, which harden after implantation, causing an increased foreign body reaction, pain, and risk of organ perforation.

m) The large surface area of polyester promotes wicking of fluids and bacteria, and is a "bacterial super highway" providing a safe haven for bacteria.

n) Common complications associated with polyester include restriction of abdominal wall mobility and local wound disturbances. Failures of polyester often include persistent and active inflammatory processes, irregular or low formation of scar tissue, immature collagen formation, and unsatisfying integration of the mesh in the regenerative tissue area.

o) Shrinkage, stiffness, and deformation of flexible meshes is affected by scar tissue. The Parietex Progrip Mesh has inter-filament distances and pores that are too small and close together, increasing the risk of bridging by scar tissue.

49.    Defendants knew or should have known that the Parietex Progrip Mesh implanted in the groin will be subject to movement and bending. Polyester in the groin has a higher likelihood of folding and bunching, and the scar fills the spaces between the folds. The phenomenon was termed a "meshoma" because the mesh forms a tumor-like mass. Further, in 2018 the HerniaSurge Group published International Guidelines for Groin Hernia Management, which advised: "The incidence of erosion seems higher with plug versus flat mesh. It is suggested not to use plug repair techniques." These guidelines have been endorsed worldwide by hernia mesh societies.

## DEFENDANTS' ACTS & OMISSIONS REGARDING THEIR DEFECTIVE DEVICE

50.    At all material times, Defendants were responsible for designing, manufacturing, producing, testing, studying, inspecting, labeling, marketing, advertising, selling, promoting, and distributing their Parietex Progrip Mesh, and providing warnings/information about the Device.

51.    Defendants' Parietex Progrip Mesh was defectively designed and manufactured; and was also defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing, despite Defendants' knowledge of the Device's lack of safety.

52.    Defendants had independent obligations to know and timely and adequately disclose scientific and medical information about their Parietex Progrip Mesh; and to warn of their risks and side effects as soon as each Defendant was aware of them.  Defendants did not do so.

53.    Defendants also knew or should have known that their Parietex Progrip Mesh unreasonably exposed Plaintiff to the risk of serious harm, while conferring no benefit over available feasible and safer alternatives that did not present the same risks and adverse effects.

54.    Defendants made claims regarding the benefits of implanting the Device but minimized or omitted their risks and adverse effects.  Although Defendants knew or should have known that their claims were false and misleading, they failed to adequately disclose the true health consequences and the true risks and adverse effects of the Parietex Progrip Mesh.

55.    At all material times, Defendants failed to provide sufficient warnings and instructions that would have put Plaintiff, Plaintiff was health care providers, and the general public on notice of the dangers and adverse effects caused by implantation of the Parietex Progrip Mesh.

56.    Defendants have marketed and continue to market their Parietex Progrip Mesh to Plaintiff and health care providers as safe, effective and reliable, and implantable by safe and effective, minimally invasive surgical techniques.  Further, Defendants continue to market their Device as safer and more effective than available feasible alternative treatments for hernias, and other competing products.  Those alternatives have existed at all material times, and have always presented less frequent and less severe risks and adverse effects than the Parietex Progrip Mesh.

57.    The risks of the Parietex Progrip Mesh's design outweigh any potential benefits associated with the design.  As a result of their defective design and/or manufacture, an unreasonable risk of severe adverse reactions can occur, including but

not limited to: foreign body response; granulomatous response; allergic reaction; rejection; erosion; excessive and chronic inflammation; adhesions to internal organs; scarification; improper wound healing; infection; seroma; abscess; fistula; tissue damage and/or death; nerve damage; chronic pain; recurrence of hernia; and other complications.

58.    Defendants omitted mention of the Device's risks, dangers, defects, and disadvantages when they advertised, promoted, marketed, sold and distributed them as safe to regulatory agencies, health care providers, Plaintiff and other consumers.  But Defendants knew or should have known that the Parietex Progrip Mesh was not safe for its intended purposes, and that it would cause serious medical problems, including severe and permanent injuries and damages.

59.    Defendants have underreported information about the propensity of the Parietex Progrip Mesh to fail and cause injury and complications; and have made unfounded representations regarding the efficacy and safety of the Device through various means and media.

60.    Defendants knew or should have known that at all material times their communications about the benefits, risks and adverse effects of the Parietex Progrip Mesh, including communications in labels, advertisements and promotional materials, were materially false and misleading.

61.    Defendants' nondisclosures, misleading disclosures, and misrepresentations were material and were substantial factors contributing directly to the serious injuries and damages Plaintiff have suffered.

62.    Plaintiff would not have agreed to allow the implantation of the Parietex Progrip Mesh had Defendants disclosed the true health consequences, risks and adverse effects caused by their Parietex Progrip Mesh.

63.    Upon information and belief, Defendants failed to conduct adequate pre-market clinical testing and research, and failed to conduct adequate post-marketing surveillance to determine the safety of the Parietex Progrip Mesh.

64.    Upon information and belief, Defendants failed to disclose on their warning labels or elsewhere that adequate pre-market clinical testing and research, and adequate post marketing surveillance had not been done on the Parietex Progrip Mesh, thereby giving the false impression that the Device had been sufficiently tested.

65.    Upon information and belief, Defendants designed their animal studies in a manner to make their Parietex Progrip Mesh appear safer than it actually performs in humans, and to appear safer than competing safer alternative designs and procedures.

66.    Upon information and belief, during animal studies of the Parietex Progrip Mesh, Defendants' administered or directed others to administer medications to the animals that would favorably impact the study endpoints. This administration of these medications and their impact on the study endpoints were not adequately disclosed to Plaintiff, Plaintiff's physicians, or regulatory bodies.

67.    Upon information and belief, Defendants are in possession of information, such as data and reports from the Americas Hernia Society Quality Collaborative (AHSQC), that Defendants' Parietex Progrip Mesh results in significantly higher rates of numerous severe complications when compared to competitor hernia meshes. Defendants have not made such information public or disclosed such information to the FDA. Furthermore, upon information and belief, Defendants prohibit organizations, like AHSQC from releasing such information.

68.    The Parietex Progrip Mesh is defective due to Defendants' failure to adequately warn or instruct Plaintiff and her health care providers concerning at least the following subjects:

      a)  The Parietex Progrip Mesh's propensities for degradation and fragmentation.

      b)  The rate and manner of mesh erosion or extrusion in the Device.

      c)  The risk of chronic inflammation resulting from the Device.

      d)  The risk of chronic infections resulting from the Device.

e) The Device would be "tension free" only at the time of implantation; and would drastically contract once implanted.

f) The risk of recurrent hernias, intractable hernia pain, and other pain resulting from the Device.

g) The need for corrective or revision surgery to revise or remove the Device.

h) The severity of complications that could arise as a result of implantation of the Device.

i) The hazards associated with the Device.

j) The Device's defects described in this Complaint.

k) Treatment of hernias with the Device is no more effective than with feasible available alternatives; and exposes patients to greater risk than with feasible available alternatives.

l) Treatment of hernias with the Device makes future surgical repairs more difficult than with feasible available alternatives.

m) Use of the Device puts patients at greater risk of requiring additional surgery than use of feasible available alternatives.

n) Complete removal of the Device may not be possible and may not result in complete resolution of the complications, including pain.

o) The Device is cytotoxic, immunogenic, and/or non-biocompatible, causing or contributing to complications such as delayed wound healing, chronic inflammation, adhesion formation, foreign body response, rejection, infection, seroma formation, chronic pain, and others.

p) The Device significantly contracts, hardens, and deforms post-implantation.

69.   The Parietex Progrip Mesh was at all times utilized and implanted in a manner foreseeable to Defendants: Defendants generated Instructions for Use for the Device, created implantation procedures, and allegedly trained the implanting physicians. But Defendants provided incomplete and insufficient training and

1  information to physicians regarding the use of the Device, subsequent anatomical

2  changes, and aftercare of patients, including Plaintiff.

3       70.   The Parietex Progrip Mesh implanted in Plaintiff was in the same or

4  substantially similar condition as when they left Defendants' possession, and in the

5  condition directed by and expected by Defendants.

6       71.   As a result of having the Parietex Progrip Mesh implanted, Plaintiff has

7  experienced significant physical and mental pain and suffering, sustained permanent

8  injury, undergone medical treatment and will likely undergo further medical treatment,

9  and suffered financial or economic loss, including obligations for medical services and

10  expenses, lost income, and other damages.

11  **PLA MICROGRIPS: ADDED DEFECTS & RISKS**

12       72.   As an alternative to suturing or tacking a hernia mesh, Defendants added

13  thousands of resorbable polylactic microgrips (PLA Microgrips) to polyester meshes,

14  creating devices such as the Parietex ProGrip (PLA Microgrip Devices).[1]

15       73.   Defendants' PLA Mircrogrip Devices were defectively designed and/or

16  manufactured and were not reasonably safe for their intended use in hernia repair.

17  Further, the risks of the design outweighed any potential benefits associated with the

18  design.

19       74.   As a result of the defective design and/or manufacture of the PLA

20  Microgrip Devices, an unreasonable risk of severe adverse reactions can occur,

21  including but not limited to: foreign body response; granulomatous response; allergic

22  reaction; rejection; erosion; excessive and chronic inflammation; pain; immature

23  collagen formation; recurrence; infection; seroma; inability to remove; and other

24  complications.

25

26

27  [1] Defendants utilize Parietene Progrip (polypropylene) animal studies when marketing
Parietex Progrip (polyester).

28

75.     When implanted in the body the PLA Microgrips incite a profound inflammatory response and significantly lowers the local pH, resulting in pain, delayed wound healing, tissue contraction, mesh deformation, and a higher risk of recurrence due to formation of immature collagen.

76.     The PLA Microcrips are hydrophilic and therefore attract fluids to the mesh, increasing the risk of seroma and infection.

77.     Removal of a PLA Microgrip Device requires removing large amounts of underlying tissue, causing grave bodily harm, while increasing the complexity of future hernia repairs and the risk that future repairs fail.

### DEFENDANTS' ACTS & OMISSIONS REGARDING PLA MICROGRIPS

78.     Defendants provided no warning about the risks/increased risks specifically associated with the unique design of the PLA Microgrip, including the fact that the PLA Microgrips would further increase the inflammation response, and could increase the risk and severity of chronic pain and infection, and that the PLA Microgrips could prevent full removal of the device and resolution of symptoms.

79.     Without conducting any studies on humans, Defendants' claim that the "combination of mesh and microgripping technology provides immediate tension-free fixation that offers surgical efficiencies and patient advantages." This claim is false, or at very least highly misleading, as Defendants' PLA Microgrip Devices shrink and contract over time, creating significant amounts of tension, which causes chronic debilitating pain and increases the risk of hernia recurrence.

80.     Defendant's market the PLA Microgrip Devices to surgeons as being able to be positioned and fixated in less than 60 seconds. However, Defendants were silent on the extreme difficultly and even impossibility of removing their PLA Microgrip Devices when complications arise.

81.     Defendants promote their PLA Microgrip Devices as resulting in less pain, because a PLA Microgrip Device "eliminates the pain associated with traditional

tack fixation." This is an obvious statement, as Defendants' PLA Microgrip Devices do not require tacking. However, this statement is highly misleading, because the Defendants' PLA Microgrip Devices increase the risk of long-term debilitating pain when compared to available feasible alternatives.

82.     The Instructions for Use of Defendants' PLA Microgrip Devices note that "this product should be used with the understanding that infection may require removal of the mesh." However, the PLA Microgrips prevent the Device from being fully removable, resulting in chronic and systemic infections.

83.     The Instructions for Use of Defendants' PLA Microgrip Devices do not indicate how to properly remove Defendant's PLA Microgrip Devices.

84.     The Instructions for Use of Defendant's PLA Microgrip Devices warn that the possible complications associated with the use of PLA Microgrip Devices are those "typically associated with surgically implantable materials." However, Defendants' PLA Microgrip Devices are the only hernia mesh products on the market utilizing PLA Microgrips, which greatly increase the risk of inflammation, chronic pain, infection, seroma, mesh deformation, and not being able to fully remove the device when compared with other surgically implantable materials.

85.     Defendants' claim their PLA Microgrip Devices provide a reduced foreign material reaction and improved biocompatibility compared to other materials. Defendants' claim is false, or at very least highly misleading, as their PLA Microgrip Devices induce a severe foreign material reaction and are not biocompatible, which results in severe complications, injuries, and product degradation.

## ESTOPPEL AND TOLLING OF STATUTE OF LIMITATIONS

86.     Defendants are estopped from relying on any statutes of limitations or repose by virtue of their acts of fraudulent concealment, which include intentional concealment from Plaintiff and/or the general public that the Parietex Progrip is

1  defective, while continually marketing the products with the effects described in this
2  Complaint.

3       87.    Given Defendants' affirmative actions of concealment by failing to
4  disclose this known but non-public information about the defects—information over
5  which Defendants had exclusive control—and because Plaintiff could not reasonably
6  have known the Parietex Progrip was defective, Defendants are estopped from relying
7  on any statutes of limitations that might otherwise be applicable to the claims asserted
8  in this Complaint.

9       88.    Despite diligent investigation by Plaintiff into the cause of Plaintiff's
10 injuries, including consultations with Plaintiff's medical providers, the nature of the
11 injuries and damages, and their relationship to the Mesh Products were not discovered,
12 and through reasonable care and diligence could not have been discovered until a date
13 within the applicable statute of limitations for filing Plaintiff's claims. Therefore, under
14 appropriate application of the discovery rule, Plaintiff's suit was filed well within the
15 applicable statutory limitations period.

16      89.    Further, in the existence of due diligence, Plaintiff could not have
17 reasonably discovered the Defendants' wrongful conduct, including, but not limited to,
18 the defective design and/or manufacturing of the products until a date within the
19 statute of limitations. Therefore, under appropriate application of the discovery rule,
20 Plaintiff's suit was filed well within the statutory limitations period.

21                              **COUNT I**

22              **STRICT LIABILITY - MANUFACTURING DEFECT**

23      90.    Plaintiff re-alleges and incorporates by reference every paragraph of this
24 Complaint as if each were set forth fully and completely herein.

25      91.    Defendants designed, manufactured, labeled, supplied, sold, distributed,
26 marketed and/or otherwise placed into the stream of commerce the Parietex Progrip
27 Mesh implanted in Plaintiff.  The Parietex Progrip Mesh was defective in manufacture
28 and construction when it left the hands of Defendants in that its manufacture and

1  construction deviated from good manufacturing practices and/or manufacturing
2  specifications as would be used and/or maintained by a reasonably prudent and careful
3  medical device manufacturer.

4        92.    The Parietex Progrip Mesh implanted in the Plaintiff was not reasonably
5  safe for their intended uses and were defective as described throughout this complaint,
6  as a matter of law, with respect to their manufacture, in that they deviated materially
7  from Defendants' design and manufacturing specifications in such a manner as to pose
8  unreasonable risks of serious bodily harm to the Plaintiff.

9        93.    Upon information and belief, Defendants' utilized adulterated polyester in
10 the Parietex Progrip Mesh.

11       94.    Upon information and belief, Defendants' utilized an adulterated collagen
12 film.

13       95.    Upon information and belief, Defendants' altered their sterilization
14 process on the Parietex Progrip Mesh without conducting adequate safety test.

15       96.    Upon information and belief, Defendants' failed to properly conduct
16 quality controls and testing on the Parietex Progrip Mesh manufacturing system and the
17 meshes themselves.

18       97.    Upon information and belief, Defendants' failed to control the quality and
19 the similarity of the raw materials purchased and utilized in the manufacture of the
20 Parietex Progrip Mesh.

21       98.    Upon information and belief, Defendants' failed to develop adequate
22 post-manufacturing testing procedures.

23       99.    Upon information and belief, Defendants' failed to investigate, identify,
24 and correct manufacturing defects that caused certain lots and Parietex Progrip Mesh to
25 deviate from design and performance specifications.

26       100.   Upon information and belief, Defendants' failed to conduct adequate
27 stability testing, and failure to report upon same to the FDA.

28

1     101.   The Parietex Progrip Mesh, as manufactured and constructed by
2  Defendants, were unreasonably dangerous to end consumers including Plaintiff and
3  posed an unreasonable degree of risk, danger and harm to Plaintiff.

4     102.   The Parietex Progrip Mesh was expected to reach and did reach Plaintiff's
5  implanting surgeons and Plaintiff without substantial change in the condition in which
6  they were manufactured, suppled, distributed, sold and/or otherwise placed in the
7  stream of commerce.

8     103.   The manufacturing defects in the Parietex Progrip Mesh implanted in the
9  Plaintiff was not known, knowable or readily visible to Plaintiff's physicians or to
10  Plaintiff, nor were they discoverable upon any reasonable examination by Plaintiff's
11  physicians or Plaintiff.

12     104.   The Parietex Progrip Mesh was used and implanted in the very manner in
13  which it was intended to be used and implanted by Defendants in accordance with the
14  Instructions for Use and specifications provided by Defendants.

15     105.   The Parietex Progrip Mesh implanted in Plaintiff was different from the
16  intended design and failed to perform as safely as products manufactured in accordance
17  with the intended design would have performed.

18     106.   The defects in the manufacturing process employed by the Defendants
19  resulted in the sale of defective Parietex Progrip Mesh to Plaintiff.

20     107.   The defective and unreasonably dangerous condition of the Parietex
21  Progrip Mesh was a proximate cause of damages and injuries suffered by the Plaintiff.

22     108.   As a direct and proximate result of the Parietex Progrip Mesh's
23  aforementioned manufacturing defects as described herein, Plaintiff has experienced
24  significant mental and physical pain and suffering, sustained severe and permanent
25  injuries requiring past and future medical treatment, and resulting in disability,
26  impairment, loss of enjoyment of life, loss of care, comfort, and have incurred financial
27  or economic loss, including, but not limited to, obligations for medical expenses, lost
28  income, and other damages.

109.   Defendants are strictly liable to the Plaintiff for designing, manufacturing, marketing, labeling, packaging, and selling a defective product.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, together with interest, cost of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

**COUNT II**

**STRICT LIABILITY - FAILURE TO WARN**

110.   Plaintiff re-alleges and incorporates by reference every paragraph of this Complaint as if each were set forth fully and completely herein.

111.   Defendants designed, manufactured, labeled, supplied, sold, distributed, marketed and/or otherwise place into the stream of commerce their Parietex Progrip Mesh.

112.   Defendants marketed the Parietex Progrip Mesh as life-long implants.

113.   The Parietex Progrip Mesh implanted in the Plaintiff was not reasonably safe for their intended uses and were defective as described herein, as a matter of law, due to the lack of appropriate and necessary warnings. Among other subjects, Defendants did not provide sufficient or adequate warnings regarding:

a)  The lack of short- and long-term data on the Parietex Progrip Mesh;

b)  The high rate of infection associated with the Parietex Progrip Mesh;

c)  The risk associated with collagen film;

d)  The risk associated with PLA;

e)  The risk associated with PGLA;

f)  The risks associated with polyester;

g)  Dense adhesions;

h)  That loose and filmy adhesions would become denser over time;

28

COMPLAINT

i)   That latent severe complications may result from the dense adhesions;

j)   That the profound inflammatory response to polyester;

k)   Organ perforation;

l)   Bowel obstruction;

m) Cholecystitis;

n)   Seromas;

o)   Fistulas;

p)   The frequency of long-term recurrence;

q)   The Mesh's propensity to contract, deform, and/or shrink in-vivo;

r)   The Mesh's propensity to degrade, fragment, fray, and/or disintegrate;

s)   The risk of chronic inflammation from the Mesh;

t)   The risk of systemic complications from chronic inflammation;

u)   The risk of chronic, and untreatable infections;

v)   The risk of chronic, debilitating, and intractable pain;

w)  The need for corrective or revision surgery to adjust or remove the Mesh;

x)   The possibility that the Parietex Progrip Mesh is not fully removable;

y)   The severity of complications that could arise if the Parietex Progrip Mesh is removed;

z)   The hazards associated with the Parietex Progrip Mesh;

aa) The Parietex Progrip Mesh defects as described herein;

bb)  Treatment with the Parietex Progrip Mesh is no more effective than feasible, available alternatives;

cc)   Complete removal of the Hernia Mesh Product may not result in complete resolution of the complications, including pain; and

dd)      Complete removal of the Parietex Progrip Mesh may not be possible.

114.   Defendants failed to properly and adequately warn and instruct Plaintiff and Plaintiff's treating physicians that Defendants' Parietex Progrip Mesh was designed and/or manufactured in a way that could cause injuries and damages, including lasting and permanent injuries.  Defendants further failed to inform or warn Plaintiff and Plaintiff's treating physicians with respect to the selection of appropriate candidates to receive Defendants' Parietex Progrip Mesh and the most effective techniques to remove the Defendants' Parietex Progrip Mesh in the event of complications.

115.   Defendants failed to properly and adequately warn and instruct Plaintiff and Plaintiff's treating physicians as to the risks of the Defendants' Parietex Progrip Mesh. To the contrary, Defendants withheld information from Plaintiff and Plaintiff's physicians regarding the true risks related to implantation of their Parietex Progrip Mesh.

116.   Defendants failed to properly and adequately warn and instruct Plaintiff and Plaintiff's treating physicians that inadequate research and testing of Defendants' Parietex Progrip Mesh was done prior to the Parietex Progrip Mesh being placed on the market and in the stream of commerce and that Defendants lacked a safe, effective procedure for removal of the Parietex Progrip Mesh once complications from their meshes arise.

117.   Defendants intentionally, recklessly, and maliciously misrepresented the efficacy, safety, risks, and benefits of Defendants' Parietex Progrip Mesh, understating the risks and exaggerating the benefits in order to advance their own financial interest, with wanton and willful disregard for the rights, safety and health of Plaintiff.

118.   Plaintiff and Plaintiff's physicians were unaware of the defects and dangers of Defendants' Parietex Progrip Mesh, and were unaware of the frequency, severity and duration of the risks associated with the Parietex Progrip Mesh.

119.   Defendants failed to adequately warn or train Plaintiff or their physicians that the surgery required to remove the Parietex Progrip Mesh in the event of

1  complications would obviate any purported benefit associated with implantation, and

2  would involve additional, significant risks to the patient.

3      120.   If Plaintiff or Plaintiff's physicians had been properly warned of the

4  defects and dangers of Defendants' Parietex Progrip Mesh, and of the frequency,

5  severity and duration of the risks associated with the Parietex Progrip Mesh, Plaintiff

6  would not have consented to the implant, and Plaintiff's physician would not have

7  implanted the Defendants' Parietex Progrip Mesh.

8      121.   As a direct and proximate result of the Defendants' design, manufacture,

9  marketing, sale, labeling and distribution of the Parietex Progrip Mesh, Plaintiff have

10  experienced significant mental and physical pain and suffering, sustained severe and

11  permanent injuries requiring past and future medical treatment, resulting in disability,

12  impairment, loss of enjoyment of life, loss of care, comfort, and have incurred financial

13  or economic loss, including, but not limited to, obligations for medical expenses, lost

14  income, and other damages.

15      122.   Defendants are strictly liable to the Plaintiff for their wrongful conduct in

16  failing to properly warn Plaintiff and Plaintiff's physicians, and for designing,

17  manufacturing, marketing, labeling, packaging, and/or selling a defective product.

18      123.   Defendants are equitably estopped from asserting a learned intermediary

19  defense due to Defendants' fraudulent concealment, through affirmative

20  misrepresentations and omissions, from Plaintiff and Plaintiff's physicians of the risks

21  and defects associated with the Parietex Progrip Mesh, including the severity, duration

22  and frequency of risks and complications. Defendants affirmatively withheld and/or

23  misrepresented facts concerning the safety of the Parietex Progrip Mesh, including but

24  not limited to adverse data and information from studies and testing conducted with

25  respect to the Parietex Progrip Mesh that showed the risks and dangers associated with

26  the Parietex Progrip Mesh was unreasonable, which were intentionally withheld from

27  Plaintiff and Plaintiff's physicians. As a result of Defendants' misrepresentations and

28  concealment, Plaintiff and Plaintiff's physicians were unaware, and could not have

known or have learned through reasonable diligence that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of the wrongful acts and/or omissions of the Defendants.

WHEREFORE, Plaintiff demand judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, together with interest, cost of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT III
## NEGLIGENCE

124.    Plaintiff re-alleges and incorporates by reference every paragraph of this Complaint as if each were set forth fully and completely herein.

125.    At all relevant times, Defendants had a duty to individuals, including the Plaintiff, to exercise reasonable and ordinary care in the manufacture, design, labeling, instructions, warnings, sale, marketing, and distribution of the Defendants' Parietex Progrip Mesh, as well as in the recruitment and training of physicians to implant the Defendants' Parietex Progrip Mesh.

126.    Defendants had a continued duty to warn individuals, including Plaintiff and Plaintiff's physicians of the known severe complications caused by Defendants' Parietex Progrip Mesh, and grave bodily harm that could result when attempting to explant the Defendants' Parietex Progrip Mesh.

127.    Defendants breached their duty of care to the Plaintiff, as aforesaid, in the manufacture, design, labeling, instructions, warnings, sale, marketing, distribution, and recruitment and training of physicians to implant the Defendants' Parietex Progrip Mesh, by:

    a)  Failing to design the Parietex Progrip Mesh so as to avoid an unreasonable risk of harm to the patients in whom the Parietex Progrip Mesh is implanted, including the Plaintiff.

b) Failing to manufacture the Parietex Progrip Mesh so as to avoid an unreasonable risk of harm to patients in whom the Parietex Progrip Mesh is implanted, including the Plaintiff.

c) Failing to use reasonable care in the testing and study of the Parietex Progrip Mesh, so as to avoid an unreasonable risk of harm to patients in whom the Parietex Progrip Mesh is implanted, including the Plaintiff.

d) Failing to use reasonable care in inspecting the Parietex Progrip Mesh so as to avoid an unreasonable risk of harm to patients in whom the Parietex Progrip Mesh is implanted, including the Plaintiff.

e) Withholding adverse information regarding Parietex Progrip Mesh within their knowledge, including but not limited to information from testing or study of Parietex Progrip Mesh and/or Device with similar design features and adverse event reporting demonstrating unacceptable risks, and thereby preventing Plaintiff and Plaintiff's physicians from understanding the risks associated with the Parietex Progrip Mesh.

f) Failing to adequately instruct, train, or warn physicians regarding the use of the Parietex Progrip Mesh, the risks associated with the Parietex Progrip Mesh, including the frequency, severity and duration of such risks, and the appropriate treatment for complications associated with Parietex Progrip Mesh.

g) Negligently or carelessly failing to properly train physicians in the implantation and/or removal of Parietex Progrip Mesh and in the appropriate treatment of complications associated with Parietex Progrip Mesh.

h) Otherwise negligently or carelessly designing, manufacturing, marketing, labeling, packaging and/or selling the Parietex Progrip Mesh.

128.    The reasons that Defendants' negligence caused the Parietex Progrip Mesh to be unreasonably dangerous and defective include, but are not limited to:

a) The use of polyester material in the Parietex Progrip Mesh and the immune reaction that results from such materials, causing short and long-term adverse reactions and injuries.

b) The propensity of the polyester component of the Parietex Progrip Mesh to degrade and fragment inside the body, causing a chronic inflammatory and fibrotic reaction, resulting in injury over time, such as adhesions, pain, seroma, infection, and mesh deformation

c) Biomaterial issues with the design of the Hernia Mesh Product, including the use of a collagen film, which:

    i.  Carries a high risk of infection;

    ii.  Does not prevent and/or adequately reduce adhesion formation;

    iii.  Is delicate and prone to tearing and/or degrading during implantation.

    iv.  Allows bare polyester to come into contact with the viscera; and

    v.  Increases the risk of adverse immunological responses.

d) Biomechanical issues with the design of the Parietex Progrip Mesh, including the propensity to shrink or contract inside of the body, which causes surrounding tissue to become fibrotic and also contract, resulting in additional chronic inflammation, mesh deformation, chronic pain, recurrence and other injuries.

e) Biomaterial issues with the design of the Parietex Progrip Mesh, including the use of PLA and PGLA in general, which elicits an intense inflammatory response as it resorbs and significantly reduces the local pH, resulting in delayed wound healing and infection, while also promoting the formation of immature collagen, increasing the risk of recurrence.

f) Biomechanical issues with the design of the Parietex Progrip Mesh, including PLA Microgrips, which are Velcro-like hooks utilized to adhere the polyester to the underlying tissue, which results in one of the following if the Defendants' Parietex Progrip Mesh fails:

    i.  Removal of large amounts of native tissue, resulting in a significantly larger defect than the Defendants' Parietex Progrip Mesh was initially utilized to repair, and thereby increasing the complexity of future repairs and increasing the probably that future repairs will fail.

    ii.  Inability to remove portions of Defendants' failed Parietex Progrip Mesh and stop the complications that the failed Parietex Progrip Mesh is causing.

129.    Defendants also negligently failed to warn or instruct Plaintiff or Plaintiff's physicians of subjects, including, but not limited to the following:

a)  The unusually high rate of infection associated with the Parietex Progrip Mesh.

b)  The propensity of the PLA and PGLA to decrease the local pH where it is implanted.

c)  The propensity of the Parietex Progrip Mesh to shrink, contract, or deform within the body.

d)  The propensity of the Parietex Progrip Mesh to degrade, fragment, fray, and unravel.

e)  The risk of intense, chronic inflammation resulting from the Parietex Progrip Mesh and the resulting potential short and long-term complications.

f)  The greatly increased risk of chronic infections resulting from the Parietex Progrip Mesh, which can form biofilms and become essentially immune from antibiotic treatment.

g)  The likely need for corrective surgery to adjust, remove, or revise the Parietex Progrip Mesh during the patient's lifetime.

h)  The frequency and severity of complications associated with the Parietex Progrip Mesh when utilized as intended.

i)  The Parietex Progrip Mesh defects described herein.

j)  Treatment with the Parietex Progrip Mesh is no more effective than feasible, available alternatives.

k)  Treatment with the Parietex Progrip Mesh expose patients to more risk than feasible, available alternatives.

l)  Use of the Parietex Progrip Mesh put patients at a greater risk of requiring additional surgeries than feasible, available alternatives.

m) Use of the Parietex Progrip Mesh make any future surgery in the same location on the patient much more complex and dangerous than if other Parietex Progrip Mesh or procedures were utilized.

n) Removal of the Parietex Progrip Mesh due to complications may significantly, and permanently impair the patient's quality of life and may not result in complete resolution of Plaintiff's injuries.

130.    Defendants knew or should have known that their failure to exercise ordinary care in the manufacture, design, labeling, instructions, warnings, sale, marketing, distribution, and recruitment and training of physicians to implant the Defendants' Parietex Progrip Mesh would cause foreseeable harm, injuries and damages to individuals implanted with the Defendants' Parietex Progrip Mesh, including the Plaintiff.

131.    Defendants knew, or in the exercise of reasonable care should have known, that the Parietex Progrip Mesh was defectively and unreasonably designed and were unreasonably dangerous and likely to injure patients in whom Parietex Progrip Mesh was implanted, like Plaintiff. Defendants knew or should have known that Plaintiff and Plaintiff's physicians were unaware of the dangers and defects inherent in the Parietex Progrip Mesh.

132.    As a direct, proximate, and foreseeable result of the Defendants' negligence, Plaintiff have experienced significant mental and physical pain and suffering, sustained severe and permanent injuries requiring past and future medical treatment, and resulting in disability, impairment, loss of enjoyment of life, loss of care, comfort, and have incurred financial or economic loss, including, but not limited to, obligations for medical expenses, lost income, and other damages.

133.    Each act or omission of negligence was a proximate cause of the damages and injuries to Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, together with interest, cost of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

**COUNT IV**

**FRAUDULENT CONCEALMENT**

134.   Plaintiff re-alleges and incorporates by reference every paragraph of this Complaint as if each were set forth fully and completely herein.

135.   At all times relevant hereto, it was known or knowable to Defendants that their Parietex Progrip Mesh failed at a high rate and resulted in a high rate of complications.   Moreover, it was known or knowable to Defendants that the surgical technique and training of implanting physicians was not the cause of the adverse events associated with their Parietex Progrip Mesh.   It was known or knowable to Defendants that the safety and efficacy of their Parietex Progrip Mesh had not been proven with respect to, among other things, the products, their components, performance, and method of insertion.   It was known or knowable to Defendants that their Parietex Progrip Mesh was not safe and/or effective prior to Plaintiff being implanted with Defendants' Parietex Progrip Mesh.   Defendants continue to represent that their Parietex Progrip Mesh is safe and effective, including but not limited to the following representations:

a) Has no serious side effects different from older generations of similar products and/or procedures;

b) Is the fastest way to patient comfort;

c) Provides a secure and durable repair;

d) Causes less pain;

e) Reduces the need for pain medication;

f) Easy and quick to implant;

g) Fits perfectly to groin anatomy;

h) Is safe for human implantation;

i) Was adequately tested and/or studied prior to entering the stream of commerce;

j) Could be safely removed in the event of complications, such as infection;

k) Low complication rates;

l)   When complications occur, they are minor;

m) Safer than alternatives;

n)  Better than alternatives;

o)  Cheaper than alternatives;

p)  Does not contract;

q)  Preserves sensitive tissue;

r)  Preserves sensitive organs;

s)  Preserves nerves;

t)  Has been adequately sterilized;

u)  Can safely be cut and/or resized.

136.   Defendants concealed information about their Parietex Progrip Mesh from Plaintiff, Plaintiff's surgeons, and the medical community, prior to Plaintiff's being implanted, including but not limited to:

a)  Defendants knew from other doctors and, by and through their agents, employees, sales representatives and distributors that their Parietex Progrip Mesh was failing at a high rate, and Defendants failed to disclose this information to Plaintiff or Plaintiff's physicians prior to implantation of their Parietex Progrip Mesh.

b)  Prior to the installation of the Parietex Progrip Mesh into Plaintiff, Defendants knew from other doctors and, by and through their agents, employees, sales representatives and distributors, that other patients experienced problems with the Parietex Progrip Mesh, and Defendants failed to disclose such information to Plaintiff and Plaintiff's surgeon, including but not limited to the following:

   i.  Inability to safely remove in the event of device failure or complications;

   ii.  Inability to completely remove;

   iii.  Need for multiple, extensive revision surgeries if removal is necessary;

   iv.  How to remove;

v. Resulting defect if removed;

vi. How to repair resulting defect if removed;

vii. How to safely cut or resize;

viii. An increased risk of complications, when compared to available feasible alternatives;

ix. More severe complications when complications arise, as compared to available feasible alternatives;

x. Complications are more difficult to treat when complications arise, as compared to available feasible alternatives;

xi. Causes more severe, acute, chronic, and/or debilitation pain than available feasible alternatives;

xii. Mesh significantly contracts over time;

xiii. Complication rates increase the longer the mesh is implanted;

xiv. Incites a severe and chronic inflammatory response;

xv. Polyester degrade over time,

xvi. Polyester fibers can detach form the mesh and travel throughout the body,

xvii. Not safe for human implantation.

c) Failing to disclose that they were aware of and/or witnessed revision surgeries in which their Parietex Progrip Mesh had failed prior to the installation of the Parietex Progrip Mesh into Plaintiff, including but not limited to the following device failures:

xviii. Mesh migration;

xix. Mesh unraveling;

xx. Development of biofilm;

xxi. Mesh contracture;

xxii. Polyester degradation, and

xxiii. Nerve entrapment.

xxiv.  Significant adhesions to underlying organs.

xxv.  Mesh rupture/tearing

d)  Failing to disclose that the surgeons were complaining about the Parietex Progrip Mesh and were experiencing extreme difficulty removing the Parietex Progrip Mesh, all prior to the installation of the Parietex Progrip Mesh into Plaintiff.

e)  Failing to disclose that the animal studies Defendants conducted on their Parietex Progrip Mesh was intentionally underpowered and manipulated in various ways, such as administering drugs to the animals that would impact the study end points.

137.  Despite what was known or knowable to Defendants about the lack of safety and efficacy of their Parietex Progrip Mesh, Defendants failed to disclose this information to the Plaintiff, Plaintiff's physicians, regulatory bodies, and to the public at large.

138.  At all times relevant hereto, Defendants had a duty and obligation to disclose to Plaintiff and Plaintiff's physicians the true facts concerning their Parietex Progrip Mesh, that is, that said Parietex Progrip Mesh was dangerous and defective, lacking efficacy for its purported use and lacking safety in normal use, and how likely they were to cause serious consequences to users, including permanent and debilitating injuries. Defendants concealed these material facts prior to the time that Plaintiff was implanted with Defendants' Parietex Progrip Mesh.

139.  Defendants were under a duty to Plaintiff to disclose and warn of the defective nature of their Parietex Progrip Mesh because:

a)  Defendants were in a superior position to know the true quality, safety, and efficacy of their Parietex Progrip Mesh;

b)  Defendants knowingly made false claims about the safety and quality of their Parietex Progrip Mesh in documents and marketing materials;

c)  Defendants fraudulently and affirmatively concealed the defective nature of their Parietex Progrip Mesh from Plaintiff and Plaintiff's physicians.

140.   The facts concealed and/or not disclosed by Defendants to Plaintiff was material facts that a reasonable person would have considered to be important in deciding whether or not to purchase or use the Defendants' Parietex Progrip Mesh.

141.   At all times relevant hereto, Defendants and each of them, willfully, intentionally, and maliciously concealed facts as set forth above from Plaintiff and Plaintiff's physicians with the intent to defraud, as alleged herein.

142.   Defendants intentionally concealed or failed to disclose the true defective nature of their Parietex Progrip Mesh so that Plaintiff would request and purchase the Defendants' Parietex Progrip Mesh, and Plaintiff's healthcare providers would dispense, prescribe, and recommend the Defendants' Parietex Progrip Mesh, and Plaintiff and/or Plaintiff's healthcare providers justifiably acted or relied upon the concealed and/or non-disclosed facts to their detriment.

143.   Prior to Plaintiff's surgery, Plaintiff and Plaintiff's surgeons were induced to act in reliance on Defendants' misrepresentations and/or omissions and in fact purchased the Parietex Progrip Mesh and implanted the Parietex Progrip Mesh in Plaintiff.

144.   At all times relevant hereto, neither Plaintiff nor Plaintiff's physicians were aware of the facts set forth above, and had they been aware of said facts, they would not have acted as they did, that is, would not reasonably relied upon said representations of safety and efficacy and utilized Defendants' Parietex Progrip Mesh in their treatment. Defendants' failure to disclose this information was a substantial factor in Plaintiff's physicians selecting Defendants' Parietex Progrip Mesh. The failure to disclose also resulted in the provision of incorrect and incomplete information to Plaintiff, as patients.

145.   Upon information and belief, Defendants and/or their sales representative(s) were present during the implantation surgery, and failed to disclose the falsity of the misrepresentation and/or omissions set forth herein, and knowingly let a defective product be installed in Plaintiff.

146.   Plaintiff was ignorant of Defendants' misrepresentations and omissions.

147.   Plaintiff and Plaintiff's surgeons relied on the truth of Defendants' representations and/or omissions about the Parietex Progrip Mesh and had a right to rely on such.

148.   As a direct and proximate result of this conduct, Plaintiff was injured.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages, together with interest, cost of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT V

### NEGLIGENT MISREPRESENTATIONS

149.   Plaintiff re-alleges and incorporates by reference every paragraph of this Complaint as if each were set forth fully and completely herein.

150.   Defendants had a duty to accurately and truthfully represent to the medical and healthcare community, Plaintiff, Plaintiff's surgeons, and the public, that their Parietex Progrip Mesh had not been adequately tested and not been found to be a safe and effective treatment. The representations made by Defendants were, in fact, false.

151.   Defendants failed to exercise ordinary care in the representations concerning their Parietex Progrip Mesh while they were involved in their design, manufacture, sale, labeling, supplying, marketing, testing, quality assurance, quality control, and distribution in interstate commerce, because Defendants negligently misrepresented the Parietex Progrip Mesh high risk of unreasonable and dangerous adverse side effects.

152.   Defendants breached their duty by making misrepresentations of material facts about their Parietex Progrip Mesh to Plaintiff, Plaintiff's surgeons, and the medical community, prior to Plaintiff's implantation surgery, including but not limited to:

a) Has no serious side effects different from older generations of similar products and/or procedures;

b) Provides a secure and durable repair;

c) Prevents adhesions;

d) Is safe for human implantation;

e) Was adequately tested and/or studied prior to entering the stream of commerce;

f) Could be safely removed in the event of complications, such as infection;

g) Low complication rates;

h) When complications occur, they are minor;

i) Safer than alternatives;

j) Better than alternatives;

k) Cheaper than alternatives;

l) Does not contract;

m) Preserves sensitive tissue;

n) Preserves sensitive organs;

o) Preserves nerves;

p) Has been adequately sterilized;

q) Can safely be cut and/or resized.

r) Is the fastest way to patient comfort;

s) Causes less pain;

t) Reduces the need for pain medication;

u) Fits perfectly to groin anatomy;

153.    Defendants concealed information about their Parietex Progrip Mesh from Plaintiff, Plaintiff's surgeons, and the medical community, prior to Plaintiff's implantation, including but not limited to:

a) Defendants knew from other doctors and, by and through their agents, employees, sales representatives and distributors that their Parietex Progrip Mesh was failing at a high rate, and failed to disclose this information to Plaintiff or Plaintiff's physicians prior to implantation of the Parietex Progrip Mesh.

b) Prior to the installation of the Parietex Progrip Mesh into Plaintiff, Defendants knew from other doctors and, by and through their agents, employees, sales representatives and distributors, that other patients experienced problems with their Parietex Progrip Mesh, and Defendants failed to disclose such information to Plaintiff and Plaintiff's surgeon, including but not limited to the following:

    i.    Inability to safely remove in the event of device failure and/or complications;

    ii.    Inability to completely remove;

    iii.    Need for multiple, extensive revision surgeries if removal is necessary;

    iv.    How to remove;

    v.    Resulting defect if removed;

    vi.    How to repair resulting defect if removed;

    vii.    How to safely cut or resize;

    viii.    An increased risk of complications, when compared to available feasible alternatives;

    ix.    More severe complications when complications arise, as compared to available feasible alternatives;

    x.    Complications are more difficult to treat when complications arise, as compared to available feasible alternatives;

    xi.    Causes more severe, acute, chronic, and/or debilitation pain than available feasible alternatives;

    xii.    Mesh significantly contracts over time;

    xiii.    Complication rates increase the longer the mesh is implanted;

xiv.   Incites a severe and chronic inflammatory response;

xv.   Polyester degrades over time;

xvi.   Polyester fibers can detach form the mesh and travel throughout the body;

xvii.   Not safe for human implantation.

xviii.

c) Failing to disclose that they were aware of and/or witnessed revision surgeries in which their Parietex Progrip Mesh had failed prior to the installation of the Parietex Progrip Mesh into Plaintiff, including but not limited to the following device failures:

i.   Mesh migration;

ii.   Mesh unraveling;

iii.   Development of biofilm;

iv.   Mesh contracture;

v.   Polyester degradation, and

vi.   Nerve entrapment.

vii.   Significant adhesions to underlying organs.

viii.   Mesh rupture/tearing

d) Failing to disclose that surgeons were complaining about the Parietex Progrip Mesh and were experiencing extremely difficulty in removing the Parietex Progrip Mesh, all prior to the implantation of the Parietex Progrip Mesh into Plaintiff.

154.   As a foreseeable, direct, and proximate result of the negligent misrepresentation of Defendants, as set forth herein, Defendants knew, and had reason to know, that the Parietex Progrip Mesh had been insufficiently tested, or had not been tested at all, and that they lacked adequate and accurate warnings, and that they created a high risk—and/or higher than acceptable risk, and/or higher than reported and represented risk—of adverse side effects, including, but not limited to, dense adhesions,

pain, graft rejection, graft migration, organ damage, complex seroma, fistula, sinus tract formation, delayed wound closure, infection, sepsis, and death.

155.    The above representations and/or omissions were material and made with the intent that Plaintiff and Plaintiff's surgeons rely on and were made to persuade and induce them to choose the Parietex Progrip Mesh to be surgically implanted in Plaintiff.

156.    Defendants failed to exercise ordinary care in making the above representations and instead made the above representations and/or omissions knowing the representations were false or were ignorant of the truth of the assertion.

157.    Prior to Plaintiff's implantation surgeries, Plaintiff and Plaintiff's surgeons were induced to act in reliance on Defendants' misrepresentations and/or omissions and in fact purchased the Parietex Progrip Mesh and implanted the Parietex Progrip Mesh in Plaintiff.

158.    Upon information and belief, Defendants and/or their sales representative(s) were present during the implantation surgery, and failed to disclose the falsity of the misrepresentation and/or omissions set forth herein, and knowingly let a defective product be installed in Plaintiff.

159.    Plaintiff was ignorant of Defendants' misrepresentations and/or omissions.

160.    Plaintiff and Plaintiff's surgeon relied on the truth of Defendants' representations and omissions about the Parietex Progrip Mesh and had a right to rely on such.

161.    As a direct and proximate result of the Defendants' conduct, Plaintiff has been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and request compensatory damages,

1  together with interest, cost of suit, attorneys' fees, and such further relief as the Court

2  deems equitable and just.

3  ### COUNT VI:  PUNITIVE DAMAGES

4  162.   Plaintiff re-alleges and incorporates by reference every paragraph of this

5  Complaint as if each were set forth fully and completely herein.

6  163.   Defendants failed to adequately test and study the Parietex Progrip Mesh

7  to determine and ensure that the products were safe and effective prior to releasing the

8  products for sale for permanent human implantation, and Defendants continued to

9  manufacture and sell the Parietex Progrip Mesh after obtaining knowledge and

10  information that the products were defective and unreasonably unsafe. The limited

11  testing and study that was undertaken by Defendants prior to release and after release

12  of the Parietex Progrip Mesh, including but not limited to animal studies and human

13  clinical studies, revealed to Defendants that the risks associated with the Parietex

14  Progrip Mesh was unreasonably frequent and severe and outweighed any purported

15  benefits of the product. The adverse results of those tests and studies were intentionally

16  concealed, or else were misrepresented, by Defendants in order to continue to profit

17  from sales of Parietex Progrip Mesh. Defendants were aware of the probable

18  consequences of implantation of the dangerous and defective Parietex Progrip Mesh,

19  such as those suffered by Plaintiff. Defendants willfully and recklessly failed to avoid

20  those consequences, and in doing so, Defendants acted intentionally, maliciously, and

21  recklessly with regard to the safety of those persons who might foreseeably have been

22  harmed by the Parietex Progrip Mesh, including Plaintiff, justifying the imposition of

23  punitive damages.

24  164.   At all times relevant hereto, Defendants knew or should have known that

25  the Defendants' Parietex Progrip Mesh was inherently dangerous with respect to the

26  risks of serious complications, including but not limited to serious infections and

27  failures, pain and suffering, loss of life's enjoyment, remedial surgeries and treatments,

28  as well as other severe and personal injuries which are chronic or permanent in nature.

165.   At all times material hereto, Defendants attempted to misrepresent and did misrepresent facts concerning the safety of the Defendants' Parietex Progrip Mesh, including but not limited to adverse data and information from studies and testing conducted with respect to Parietex Progrip Mesh that showed the risks and dangers associated with the Parietex Progrip Mesh was unreasonable.

166.   Defendants' misrepresentations included knowingly withholding material information from the medical community and the public, including Plaintiff and their treating physicians, concerning the safety and efficacy of the Defendants' Parietex Progrip Mesh.

167.   At all times material hereto, Defendants knew and intentionally and/or recklessly disregarded the fact that the Defendants' Parietex Progrip Mesh cause severe and potentially permanent complications with greater frequency than safer alternative Device or treatments and that necessitate different medical treatment.

168.   At all times material hereto, Defendants intentionally misstated and misrepresented data and continue to misrepresent data so as to minimize the true and accurate risk of injuries and complications caused by the Parietex Progrip Mesh, including but not limited to data regarding the frequency, severity and duration of those risks and complications and the difficulty in effectively treating such complications.

169.   Notwithstanding their knowledge, Defendants continued to market the Defendants' Parietex Progrip Mesh to consumers without disclosing the true risk of side effects and complications, or the frequency, severity and duration of those risks, or the difficulty in effectively treating such complications.

170.   Defendants knew of the Parietex Progrip Mesh' defective and unreasonably dangerous nature, but continued to manufacture, produce, assemble, market, distribute, and sell the Device so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiff, in conscious and/or reckless disregard of the foreseeable hmm caused by the Parietex Progrip Mesh.

171. Defendants' conduct as described herein shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages.

Wherefore, Plaintiff respectfully request judgment in Plaintiff's favor and against Defendants for such amount sufficient to punish, penalize and deter Defendants' conduct and any other amounts or relief as may be fair and reasonable under the circumstances.

## **PRAYER FOR RELIEF**

Plaintiff demands judgment against Defendants, and each of them, individually, jointly and severally and prays for the following relief in accordance with the applicable law and equity, and in an amount to be proven at the time of trial:

    i.     General and Compensatory damages to Plaintiff for past, present, and future damages, including, but not limited to, pain and suffering for severe and permanent personal injuries sustained by Plaintiff, permanent impairment, mental pain and suffering, loss of enjoyment of life, past and future health and medical care costs and economic damages including past and future lost earnings and/or earning capacity together with interest and costs as provided by law;

    ii.    Punitive or exemplary damages for Defendants' wanton, willful, fraudulent, and reckless acts, established by their demonstration of complete disregard and reckless indifference for the safety and welfare of Plaintiff and the general public, in an amount sufficient to punish Defendants and deter future similar conduct;

    iii.   Special Damages;

    iv.    Statutory damages as set forth above;

    v.     Restitution and disgorgement of profits;

    vi.    Reasonable attorneys' fees as provided by law;

vii.   The costs of these proceedings, including past and future cost of the suit incurred herein;

viii.   All ascertainable economic damages;

ix.   Pre-judgment interest on all damages as is allowed by law;

x.   Post-judgment interest; and

xi.   Such other and further relief as this Court deems just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

This 25th day of May, 2022.

Respectfully submitted,

/s/ Chris W. Cantrell
William J. Doyle, II (SBN 188069)
Chris W. Cantrell (SBN 290874)
**DOYLE APC**
550 West B Street, Fourth Floor
San Diego, CA 92101
Telephone: (619) 736-0000
Facsimile: (619) 736-1111